THOMPSON, APPELLANT, *v.* THOMPSON, APPELLEE.

(No. 85 CA 18 — Decided February 24, 1987.)

*Robert J. Smith,* for appellant Dolores J. Thompson.
*Julie A. Lambe,* for appellee Gregory L. Thompson.

GREY, J. This is an appeal from a judgment of the Washington County Court of Common Pleas granting custody of Gregory W. Thompson and Samuel L. Thompson to their father, Gregory L. Thompson. We affirm.

The record reveals the following facts. Dolores and Gregory Thompson were married in 1973 and separated on July 2, 1984. The parties executed a separation agreement on July 16, 1984 giving custody to the mother, Dolores Thompson. Greg Thompson filed for divorce on October 12, 1984 and sought custody of the minor children. At that time, the trial court granted temporary

custody to Dolores Thompson who filed an answer and cross-complaint.

The trial court held hearings on the matters of divorce and custody on July 26, 1985 and August 16, 1985, and each party submitted proposed findings of fact and conclusions of law. The court's September 3, 1985 judgment entry granted Greg Thompson custody of the two children. Dolores Thompson filed a motion to modify the final entry as to custody, which was denied by the trial court on September 11, 1985. Dolores Thompson appeals the decision of the trial court on the issue of custody and assigns three errors.

### First Assignment of Error

"The trial court committed prejudicial error when it did not strongly consider which parent was the primary caretaker of the minor children."

In support of her contention, Dolores Thompson cites *In re Maxwell* (1982), 8 Ohio App. 3d 302, 8 OBR 409, 456 N.E. 2d 1218. We do not dispute that *Maxwell, supra,* stands for the proposition for which appellant cites it. The idea of giving strong consideration to which parent was the primary caretaker of the minor children has never been formally adopted by the Ohio Supreme Court.

However, it is important to examine the legal theory of the primary caretaker and the "tender years" presumption from which it has evolved.

At common law, the husband was considered the head of his family and was held responsible for the care, maintenance, education and religious training of his children. In return, he was entitled to the services and association of those children. Thus, upon divorce of the parents, the father's property rights included rights to custody of his minor children. See Foster & Freed, Life With Father: 1978 (1978), 11 Family L.Q. 321. Though based in part on the economic contribution of children to the feudal, cottage industry of an agricultural household, the father's right to custody was dependent on the presumption that he could best provide for their needs:

"* * * This right is not given him solely for his own gratification, but because nature and the law ratifying nature assume that the author of their being feels for them a tenderness which will secure their happiness more certainly than any other tie on earth. Because he is the father, the presumption naturally and legally is that he will love them most, and care for them most wisely. And, as a consequence of this, it is presumed to be for the real interest of the child that it should be in the custody of its father * * *." *Hibbette* v. *Baines* (1900), 78 Miss. 695, 703, 29 So. 80, 81.

Thus, the interests of the *child* were seen as best served when such child was placed in the care of the father. This was long before the term "best interest of the child" came to be used in custody determinations.

Due to recognized hardships and cruelty imposed on unoffending mothers by this rigid paternal-preference rule, the courts in the Nineteenth Century began to expand their discretionary powers and to consider *all* the needs of the child — physical, emotional, psychological, as well as financial. See the discussion in *Ex parte Devine* (Ala. 1981), 398 So. 2d 686, 689. What emerged was the replacement of the paternal presumption with the "tender years" doctrine.

The decision of *Helms* v. *Franciscus* (Md. 1830), 2 Bland Chancery Reports 544, is recognized as the origin of the tender years presumption. The *Helms* court carved out an exception to the custody rights of the father in the case of infants: "* * * The mother is the softest and safest nurse of infancy, and

with her it will be left in opposition to this general right of the father." (Footnote omitted.) *Id.* at 563. Thus, the pendulum swung away from the paternal preference and the "tender years" presumption was used as a tie breaker when both parents were equally fit to assume custody. The difference in result stemmed from the perceived differences in the "natural rights" of the respective parents:

"* * * There is the natural right of the mother, who is not shown to be unfit, to nurture and care for her child of tender years, and ordinarily the child's best interests are served by the mother's love, care and attention. * * *" *Fitzpatrick* v. *Fitzpatrick* (1965), 4 Ohio App. 2d 279, 282-283, 31 O.O. 2d 257, 260, 207 N.E. 2d 794, 797.

Procedurally, the tender years doctrine became as formidable as the common-law paternal preference. The father could obtain custody of his child of tender years *only* if he could prove the mother unfit.

Though weakened by its obvious constitutional infirmities, see *Reed* v. *Reed* (1971), 404 U.S. 71, and *Caban* v. *Mohammed* (1979), 441 U.S. 380, the tender years doctrine remains in effect in some form in at least twenty states. Its resiliency stems in part from the fact that the presumption was explained in terms of the child's best interest. The doctrine has been described as being "simply a shorthand method of expressing the best interest of children * * *." Uniform Marriage and Divorce Act, Section 402 Commissioners' Note (1979), 9A U.L.A. 96, 198. The common-law paternal preference was based on outmoded views of property rights, and considered the child's interests only as an afterthought. Similarly, it was only after the courts recognized that the tender years doctrine was based on outmoded social and sexual stereotypes — rather than the child's best interest — that the doctrine lost its status as a

presumption. See *State, ex rel. Watts,* v. *Watts* (1973), 77 Misc. 2d 178, 350 N.Y. Supp. 2d 285.

Current child development and psychological thought asserts that both. male and female parents are equally able to provide care and perform child-rearing functions. *Id.* at 182, 350 N.Y. Supp. 2d at 289-290. Thus, the term "best interest of the child" emerged as the current custody standard, but it is only a term. Like the other shorthand terms used in the past it is only a way of expressing society's concern that its children be properly cared for. The term "primary caregiver" is now coming into vogue, so we must analyze this new term under the current best interest standard.

In Ohio, the best interest of the child is determined by the criteria in R.C. 3109.04. In making this determination, the age and sex of the child may be considered, but the sex of the parent may not. R.C. 3109.03. Courts in other states with similar provisions have, however, continued to apply the tender years presumption, being careful to couch their holding in terms of the child's best interest. *Solly* v. *Solly* (Fla. App. 1980), 384 So. 2d 208. A recent study showed that mothers are still awarded custody over fathers in a large majority of contested cases, and those fathers who did receive custody were able to prove the mother *unfit* — thus rebutting the unspoken presumption. See Pearson & Ring, Judicial Decision-Making in Contested Custody Cases (1983), 21 J. Family L. 703, 715-716.

In *In re Maxwell, supra,* the court added another factor to the statutory criteria determining the best interest of the child. Borrowing from the decision of Justice Neely of the West Virginia Supreme Court of Appeals in *Garska* v. *McCoy* (1981), 278 S.E. 2d 357, the *Maxwell* court held that where either parent could equally fulfill the responsibilities of primary custody, the court must con-

sider which parent was the "primary caretaker" of the child. Interestingly, Justice Neely relied on the "primary caretaker" rule solely to take the place of the tender years presumption abolished by statute in 1980. See 1980 W. Va. Laws, 109, 110 (§ 48-2-15). Justice Neely recognized that the primary caretaker is, in the majority of cases, still the mother. *Garska,* at 360.

Although the *Maxwell* court did not raise the primary caretaker rule to the level of a presumption, as it could not do under R.C. 3109.04(C), the result is much the same when a court uses this factor as the deciding factor in close cases. We do not quarrel with the reasoning behind the rule, nor with its consideration in appropriate circumstances. We are concerned, however, with the use of any rule as a "substitute for a searching factual analysis of the relative parental capabilities of the parties, and the psychological and physical necessities of the children. * * *" *Ex parte Devine, supra,* at 696.

We find that the court below made such an analysis here, even though it did not specifically couch its decision in the language of the primary caretaker doctrine. There is nothing magical about the words "primary caregiver," and Ohio has not adopted or rejected it as a doctrine either by statute or case law. To allow the parent who has been the primary caregiver to continue having custody is often necessary for the best interest of the child. We hold that the primary caregiver doctrine is part of the best interest of the child and is included in the language of R.C. 3109.04(C)(3), "[t]he child's interaction and interrelationship with his parents * * *." Our review of the record leads us to conclude that the trial court did consider, among all the criteria listed in R.C. 3109.04(C), who was the primary caregiver. Since the primary caregiver doctrine has never formally been adopted in Ohio,

however, the trial court may have been hesitant to use those magical words. This was not error.

Dolores Thompson's first assignment of error is without merit and is overruled.

### Second Assignment of Error

"The trial court committed prejudicial error in determining the issue of custody when it failed to apply and follow the guidelines mandated by O.R.C. § 3109.04(B) in effecting a change of custody from a previous order."

Appellant mistakenly asserts that the controlling statute in the instant case is R.C. 3109.04(B). Dolores Thompson requests this court to view the trial court's grant of permanent custody to Greg Thompson as a modification of a previous custody order pursuant to R.C. 3109.04(B). This we are not persuaded to do.

In support of Dolores Thompson's assertions, she cites this court's decision in *Gwinn* v. *Gwinn* (Mar. 29, 1983), Lawrence App. No. 1535, unreported, for the proposition that R.C. 3109.04(B) applies in cases where a court has made an interlocutory order respecting custody pending a final divorce decree. *Gwinn* is not applicable here because the *Gwinn* case was postured on a motion to change custody, not to make an original award of custody.

Recent Ohio case law supports the premise that R.C. 3109.04(B) is not applicable when a *pendente lite* award of custody is made prior to a final divorce hearing. In *Schoffner* v. *Schoffner* (1984), 19 Ohio App. 3d 208, 19 OBR 352, 483 N.E. 2d 1190, syllabus, the court held:

"An interlocutory order respecting custody of children made pursuant to Civ. R. 75(M) is by its very nature temporary and is subject to modification upon the entering of the final divorce decree. Therefore, the trial court need not make a finding as to the re-

quirements of R.C. 3109.04(B) prior to entering a final custody decree, as the provisions of R.C. 3109.04(B) are only applicable to final decrees awarding custody in the action or a subsequent modification of such final decrees." See, also, *Spence* v. *Spence* (1981), 2 Ohio App. 3d 280, 2 OBR 310, 441 N.E. 2d 822.

We find the court's holding in *Schoffner* to be most persuasive and adopt it as authority in the instant case.

The order granting Dolores Thompson custody of her sons was interlocutory in nature and subject to the trial court's final decree on the issue of custody. It must be noted that temporary custody was granted *ex parte* to her without an oral hearing. To assert that the trial court's temporary award requires an R.C. 3109.04(B) showing to alter it circumvents the statutory purpose of R.C. 3109.04(A). R.C. 3109.04 (A) requires that the court award custody of minor children *after* hearing testimony from either or both parties. It is evident from the October 12, 1984 journal entry that there was *no* hearing and *no* testimony from either party. Statutorily there was no determination of final custody pursuant to R.C. 3109. 04(A), making R.C. 3109.04(B) inapplicable.

We note that the parties originally agreed that Dolores Thompson would retain custody of the minor children as per the July 16, 1984 separation agreement. At trial, each party presented testimony on the issue of custody. Neither party relied on the separation agreement as written. The issue of the separation agreement was not raised before this court. Thus we will not treat its enforceability.

Appellant's second assignment of error is without merit and is overruled.

### Third Assignment of Error

"The findings of fact and decision of the trial court are not supported by the evidence presented and are against the manifest weight of the evidence and thus contrary to law."

The trial court after hearing and weighing all the testimony and evidence awarded custody to Greg Thompson. In a divorce-custody hearing, the trial court is in the best position to make a determination as to an award of custody. In *Trickey* v. *Trickey* (1952), 158 Ohio St. 9, 13, 47 O.O. 481, 483, 106 N.E. 2d 772, 774, the Ohio Supreme Court held:

"In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by [the] printed record. * * *"

The court also held that "in an appeal on questions of law the Court of Appeals can not substitute its judgment for the judgment of the trial court. * * *" *Id.* at 14, 47 O.O. at 483, 106 N.E. 2d at 774.

As a reviewing court, we may reverse the trial court when we find that the trial court has abused its discretion. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Martin* v. *Martin* (1985), 18 Ohio St. 3d 292, 18 OBR 342, 480 N.E. 2d 1112. There is nothing in the record to indicate that the trial court's decision was arbitrary, unreasonable, or unconscionable.

Rather, the evidence presented by the parties supports the trial court's decision. " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Ross* v. *Ross*

(1980), 64 Ohio St. 2d 203, 205, 18 O.O. 3d 414, 415, 414 N.E. 2d 426, 428, quoting from *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578, syllabus. A thorough review of the record indicates that there was competent, credible evidence presented on which the trial court based its decision to grant Greg Thompson custody of his two minor sons. Thus, Dolores Thompson's third assignment of error is without merit and is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

ABELE, J., concurs.

STEPHENSON, P.J., concurs separately.

STEPHENSON, P.J., concurring. I concur in the judgment and opinion except that portion which states the following:

"We hold that the primary caregiver doctrine is part of the best interest of the child and is included in the language of R.C. 3109.04(C)(3), '[t]he child's interaction and interrelationship with his parents * * *.'" *Supra,* at 257.

The factors enumerated in R. C. 3109.04(C) are non-exclusive and permit the court to utilize all relevant factors even if not set forth in the statute. I am not persuaded that the General Assembly intended by implication to include the primary-care doctrine in R.C. 3109.04(C). Had that been intended, it would seem reasonable that appropriate language to that effect would have been included in R.C. 3109.04(C) or in a separate subsection of the statute.

Nevertheless, I agree that it is a relevant factor that should be considered by the court in determining the best interest of the child. This is the approach set forth in *In re Maxwell* (1982), 8 Ohio App. 3d 302, 8 OBR 409, 456 N.E. 2d 1218, and one which I would adopt.